NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 170611-U

NO. 4-17-0611

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 29, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| TYREE D. JENKINS, | ) | No. 16CF1501 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Phoebe S. Bowers, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Steigmann and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court erred in failing to appoint separate counsel after conducting a *Krankel* hearing.

¶ 2    In October 2016, the State charged defendant, Tyree D. Jenkins, with aggravated domestic battery causing great bodily harm, domestic battery with a prior domestic battery conviction alleging bodily harm, and domestic battery with a prior domestic battery conviction for making physical contact of an insulting or provoking nature. Prior to trial, defense counsel notified the court of a waivable *per se* conflict between defense counsel and defendant based on counsel's prior representation of the victim. After being admonished by the trial court, defendant waived the conflict. In April 2017, a jury found defendant guilty of aggravated domestic battery and domestic battery with a prior domestic battery conviction.

¶ 3    In June 2017, prior to sentencing, defendant raised, *pro se*, an issue of ineffective assistance of counsel. After some preliminary questioning of defendant, the trial court asked that

he put his claims in writing. Defendant agreed, and the matter was continued for that purpose. At the next hearing, the court questioned defendant about each of the individual claims he raised in his written motion, characterizing it as a pre-inquiry hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). During the hearing, defendant informed the court defense counsel failed to use evidence, call witnesses he provided, and listen to his suggestions regarding trial strategy. Furthermore, defendant alleged counsel improperly commented on previously excluded evidence prejudicial to defendant in his opening statement and failed to secure evidence available from the police department and defendant's telephone records, which would have supported his defense. He also claimed he waived any potential *per se* conflict with his attorney because his defense counsel suggested he should and he did not want to "be stuck sitting in Macon County jail another four or five months before going to trial." The court then inquired of defense counsel regarding each of the allegations raised and commented upon its own recollection regarding the hearing during which the conflict of interest issue was raised. After a lengthy evidentiary hearing where the court questioned both defendant and his counsel, the court concluded the matters raised "deal with [defense counsel's] trial strategy" and denied defendant's claim of ineffective assistance of counsel.

¶ 4 Defendant's posttrial motion raised three issues: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred by allowing the State to submit the original charging information to the jury as part of the propensity evidence it was allowed to present, the prejudicial effect of which far outweighed its probative value; and (3) the court erred in allowing a State's witness to testify about previous Illinois Department of Children and Family Services (DCFS) involvement to restrict defendant's contact with the victim, in violation of a defense motion *in limine* previously granted by the court. After hearing the arguments of

counsel, the court denied the motion and the matter proceeded immediately to sentencing. Defendant, although convicted of a Class 2 aggravated domestic battery and a Class 4 domestic battery, was subject to Class X sentencing due to prior Class 2 or greater felony convictions. The State suggested a sentence in excess of 18 years, while defendant's counsel argued for a sentence of 6 or 7 years. The court sentenced defendant to a term of 12 years in the Department of Corrections with 4 years' mandatory supervised release (MSR) on the aggravated domestic battery conviction and 3 years in the Department of Corrections on the domestic battery with a prior conviction with 4 years' MSR, to be served concurrently. This appeal follows.

¶ 5        On appeal, defendant argues the trial court erred by: (1) allowing the State to introduce charging documents of defendant's prior convictions as propensity evidence, (2) failing to appoint replacement counsel on his postplea complaint about trial counsel's performance pursuant to *Krankel*, (3) entering convictions for aggravated battery and domestic battery in violation of the one-act, one-crime rule, and (4) not allowing defendant to rescind a *per se* conflict of interest waiver with his attorney after trial. We reverse and remand for further proceedings consistent with this order.

¶ 6                                    I. BACKGROUND

¶ 7        In October 2016, the State charged defendant with one count each of aggravated domestic battery (count I) (720 ILCS 5/12-3.3(a) (West 2014)), domestic battery with a prior domestic battery conviction alleging bodily harm (count II) (720 ILCS 5/12-3.2(a)(1) (West 2014)), and domestic battery with a prior domestic battery conviction with physical contact of an insulting or provoking nature (count III) (720 ILCS 5/12-3.2(a)(2) (West 2014)). Count II was dismissed before trial. The victim was the same in all three counts.

¶ 8        In January 2017, the trial court conducted a hearing on the State's first motion

*in limine* seeking to present evidence of defendant's propensity to commit domestic violence

pursuant to section 115-7.4 (725 ILCS 5/115-7.4 (West 2016)). The State sought to introduce

defendant's prior convictions, which included Macon County case No. 15-CF-877, a 2015

conviction for unlawful restraint, Macon County case No. 12-CF-219, a 2012 conviction for

domestic battery with a prior domestic battery, and Macon County case No. 08-CF-1018, a 2008

conviction for aggravated battery. During the hearing, defendant objected to the admission of

these prior convictions and claimed allowing the introduction of all three incidents into evidence

would be unduly prejudicial. The State argued the introduction of the propensity evidence via

certified copies of conviction, in lieu of live witness testimony about prior domestic violence

incidents, would limit any undue prejudice. After analyzing the propensity factors under section

115-7.4, the court determined any undue prejudice was outweighed by the probative value and

granted the State's motion, approving the use of the certified copies of conviction.

¶ 9        Later that same month, the trial court heard arguments on the State's second

motion *in limine* requesting to supplement its propensity evidence. Two of the previous

convictions (unlawful restraint and aggravated battery) were not identified in the certified copies

of conviction as offenses specifically related to domestic violence. The State suggested the court

read the charging document for each conviction, which contained language either identifying the

domestic relationship between the defendant and the victim (No. 12-CF-219) or identifying the

victim as the same person in this case (No. 15-CF-877). Defendant's position regarding the use

of the charging documents was as follows:

> "Judge, in light of the court's ruling initially on this matter, just
>
> show our objection to that. I am not going to have any argument

with regard to that particular issue at this time. The court has ruled on the right of the State to bring those convictions out for a limited purpose. So[,] we would have no [*sic*]—nothing else to say."

The trial court ruled the State could present evidence of defendant's propensity to commit domestic violence by reading the information contained in the certified copy of the 2015 unlawful restraint and 2012 domestic battery convictions. The court also indicated it had reconsidered its previous ruling allowing the use of the 2008 conviction, concluded it was too remote in time to be admissible as propensity evidence, and declined to permit it. The court also addressed the State's third *in limine* motion seeking to elicit testimony from a DCFS investigator regarding her reasons for investigating the victim's residence, which led to the charges in this case. Specifically, the State sought to have the investigator testify that she responded to an anonymous call indicating defendant was at the victim's residence because she was aware defendant was not supposed to be at the residence due to a previous domestic violence incident (which formed the basis for Macon County case No. 15-CF-877). Defendant objected, arguing, "[t]he fact that the State is going to be allowed to introduce the prior convictions and naming the defendant I think should be sufficient." The trial court agreed and denied the State's motion, acknowledging that although the DCFS worker could testify about what she observed when she arrived at the victim's residence, "I am not going to allow you to get into that she received anonymous phone calls or that she was concerned about a prior domestic violence incident."

¶ 10    In April 2017, immediately before proceeding with jury selection, it was brought to the trial court's attention a potential conflict of interest may exist between defense counsel and the victim in this case. Defense counsel, for the first time, indicated he represented the victim in a previous matter. He believed his previous representation resulted in a *per se* conflict but that it

could be waived by defendant. The State contended there was insufficient evidence before the court to determine whether the conflict could be waived. Through the court's inquiry, defense counsel testified he previously represented the victim in a 2013 Macon County criminal case but could not recall any specifics regarding the prior representation. He "vaguely" remembered the case and was only aware of what happened by reviewing the court docket. From that review, he was aware the victim's case was resolved in April 2014, and, since that time, he has had no contact with her. He (incorrectly) believed he represented defendant before, and he also believed his prior representation of the victim would not conflict with his ability to fully represent defendant. The court gave defendant the opportunity to ask defense counsel any questions about the potential conflict of interest; however, defendant declined.

¶ 11　　　　The trial court admonished defendant as follows:

"THE COURT: [Defense counsel] has represented [the victim] in the past. *** [Defense counsel] just testified that he no longer represents [the victim] and that case was resolved in April of 2014, so approximately three years ago. [Defense counsel] [is] not contemporaneously representing you and [the victim]; however, you do need to be aware that he represented her in the past and *** may conflict with your interest, and thus impair his ability to perform as your attorney. Now, he just testified that he does not remember [the victim] and has had no contact with her, to his knowledge, since April of 2014. But just so you are aware, the potential—an example of a potential problem in a case like this would be maybe he wouldn't cross examine her to the same extent

or with the same thoroughness that he would normally cross examine another witness. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: In light of all of this information, and you may want to take some time to decide this, but do you know whether or not you want to waive this potential conflict of interest?

THE DEFENDANT: Yes, I do want to waive it.

THE COURT: Okay. Do you knowingly and voluntarily waive any possible conflict of interest [defense counsel] may have as your attorney in this case?

THE DEFENDANT: Yes."

Following this exchange, the court found defendant waived the potential conflict of interest on the record and accepted the waiver. The matter then proceeded to a jury trial.

¶ 12        At the close of the State's evidence, the State introduced the certified copies of conviction and charging documents from the 2012 and 2015 convictions as exhibit Nos. 3 and 4. The State had previously suggested the trial court inform the jury defendant was convicted of those two offenses and then read the charging information for both offenses. Defense counsel voiced no objection to this procedure. The court admitted this evidence and indicated the exhibits would not be sent back to the jury.

¶ 13        The jury subsequently returned verdicts of guilty for both aggravated domestic battery and domestic battery with a prior domestic battery conviction, and the matter was set for sentencing on June 1, 2017.

¶ 14     In May 2017, defense counsel filed a motion to continue the sentencing based, in part, upon his belief the court should conduct at least a preliminary inquiry under *Krankel* due to defendant's comments at their last meeting in preparation for sentencing. Counsel claimed defendant "told [counsel] to leave and that he did not want to meet with him again concerning the sentencing or any matter regarding this case." As a result, counsel did not believe he was adequately prepared for the sentencing hearing and believed the court should inquire further of defendant. The trial court asked defendant, "[a]re you in effect making a claim that [counsel] was ineffective when he was representing you?" Defendant said he asked defense counsel to do things before the trial, which defense counsel allegedly did not do, and when he confronted counsel about it, counsel began cursing at him, so defendant told counsel he did not need to come back to see defendant anymore. The court then suggested perhaps the best way to proceed was to allow defendant time to reduce his claims to writing so the court and counsel could review all of his arguments on why defendant believed his counsel was ineffective, and the court could then evaluate the merit of each claim. The defendant agreed, and the court then indicated it was continuing the matter "for a *Krankel* hearing."

¶ 15     Several weeks later, in June 2017, after having received defendant's written claims, the trial court called the matter for what it characterized as a "pre-inquiry under People versus *Krankel*." The court informed defendant it had read his claim and was providing defendant with an opportunity to more fully explain his allegations. Defendant stated defense counsel did not represent him in a proper manner during trial, defense counsel refused to present a social media video which defendant believed was relevant to his defense, and defense counsel did not put certain witnesses on the stand. Defendant also told the court he waived the potential conflict with his attorney because he did not want to "be stuck sitting in Macon County jail

another four or five months before going to trial." The court directed defendant to address each allegation contained in the list of claims and provided defendant an opportunity to explain in detail why he thought defense counsel was ineffective. As defendant addressed his claims, the court from time to time interjected questions regarding the merits of those claims. The court asked defendant to relate specific conversations with counsel, explain the relevance of certain information, elaborate on evidence or witnesses defendant wanted counsel to present at trial, and then turned to defense counsel for a response before proceeding to the next issue. Although defendant's claims were lengthy and quite detailed, we will outline only a few here in order to provide sufficient background for the analysis to follow.

¶ 16        Defendant complained about the fact counsel elected to present information in his opening statement which had been expressly excluded by the court. The State's third motion *in limine* sought to elicit testimony from DCFS worker Ali Collins to explain why she went to the victim's home after receiving information defendant was present. The State sought to bring out the existence of defendant's previous domestic incident involving the same victim and DCFS's involvement, which emanated from the incident. Defendant's counsel objected, and after a full hearing, the court sustained the objection and excluded the requested information. Defendant pointed out, during his opening statement, counsel mentioned the previously excluded information, including prior reports of domestic violence at the residence, resulting in a sidebar conference at the State's request. Defendant contended counsel never explained what occurred at sidebar even after his inquiry and did not explain why he decided to mention the same information to which counsel had objected and argued successfully to exclude at a previous hearing. The court then turned to counsel for his response and counsel noted (albeit incorrectly), "we had filed a motion *in limine* with regard to certain statements I think Ali Collins had made,

arguments, and that was indeed, I think restricted." He then went on to explain, "in our theory of the case, it was an important element that DCFS was involved in the case," and that DCFS's threat to remove the victim's children was why she changed her version of how her injuries occurred from a fight with three girls to a fight with defendant.

¶ 17　　　　The trial court then directed defendant to the next allegation in his list, which related to the conflict of interest counsel raised on the day of trial immediately before jury selection was to begin. According to defendant, counsel had been aware of this for months; however, he kept telling defendant it was the State who was voicing some concern or objection to his continued representation of defendant. Defendant indicated on the day of trial, his attorney brought this to the court's attention and the prosecutor "clearly stated, she didn't have a problem with—or she never mentioned anything about, um, the conflict of interest." According to defendant, "right before that when he had—before we had the hearing, he just told me to waive it." Defendant expressed his dissatisfaction with what he perceived as counsel's attitude about his case and said when he waived the conflict, "I waived it because I was under the impression— he did tell me if I waived, it could be another four or five months before I could get in trial again." The court did not seek counsel's response at that time, but instead, it began asking defendant about the court's inquiry of defendant at the hearing on the waiver, asking defendant to confirm whether the court's representations were correct.

¶ 18　　　　The inquiry then turned to the existence of a video, which defendant contended had been available for some time, "depicting me and the victim—it was showing me and the victim at the hospital and two girls at the hospital sitting somewhere recording both of us. And they were openly talking about what they had did [*sic*] to this victim." The court then permitted counsel to respond to both the conflict and video issues. Counsel acknowledged previous

conversations about the conflict with defendant, characterizing it as a "potential conflict." He did not recall telling defendant, "it's gonna be two or three months if you don't waive it," calling that a "non-issue" at the time. Counsel said he and his investigator viewed the video, contended they could not "properly lay a foundation for the video," and that it "didn't lend anything to complete our theory of the case."

¶ 19 Defendant's concerns extended to specific questions asked or areas of inquiry he had asked counsel to pursue, such as the "theory" of the case, witnesses to be called, and telephone records or text messages to be obtained. In each instance, the trial court asked defendant to explain his objections in detail and then sought counsel's response. Frequently, when given the opportunity, defendant disagreed with some of the factual assertions of counsel, and they disagreed over whether certain issues had, in fact, been brought to counsel's attention. After hearing defendant's claims and defense counsel's responses the court stated:

> "There are many statements made in the written motion, as well as here in court today. All of the statements that I have heard and that I have read deal with [defense counsel's] trial strategy. He talks about the theory of the case. And many times in his responses, his decision whether to make objections or have certain witnesses testify or bring certain evidence in to—to the jury, [*sic*] there are questions of trial strategy, which is why you have a lawyer appointed for you, or hire a lawyer."

The court then stated, "I'm going to deny the claim of [*sic*] [defendant's] claim of ineffective assistance of counsel.

In July 2017, the trial court heard defendant's motion for a new trial or for judgment notwithstanding the verdict in advance of sentencing. In his posttrial motion, defendant argued the State failed to prove him guilty beyond a reasonable doubt, the court erred in allowing the reading of the informations as part of the presentation of propensity evidence, and the court erred by allowing the DCFS worker to testify about previous DCFS involvement restricting defendant's contact with the victim. The court denied the motion and the matter proceeded to sentencing.

¶ 20    At the sentencing hearing, the State offered a series of "sworn statements," apparently from police reports relating to other incidents of domestic violence, some charged but resulting in no convictions, others where no charges were filed. Defendant objected to all of them, and the trial court ultimately refused to consider three. A written victim impact statement was also provided to the court, as well as photographs admitted at trial showing the injuries suffered by the victim. Defendant called his mother, father, sister, and friend to testify on his behalf. At the close of the evidence, the State recommended a sentence in excess of 18 years, defendant argued for 6 to 7 years, and the court sentenced defendant to 12 years on the aggravated domestic battery conviction (sentenced under Class X sentencing pursuant to 730 ILCS 5/5-4.5-95(b) (West 2016)) and 3 years for the domestic battery with a prior domestic battery conviction.

¶ 21    In August 2017, defendant asked the trial court to reconsider its sentence, contending the court abused its discretion by sentencing him to an excessive term of years. Defendant contended his sentence was enhanced because of his prior convictions and the fact that he must serve 85% of any sentence imposed, and therefore 12 years was excessive. Defendant also asked the court to consider the credibility of the witnesses and the facts of the

case in imposing a lesser sentence. The State noted his prior criminal history, his history with this victim, and the serious nature of the injuries inflicted. The trial court denied defendant's motion.

¶ 22          This appeal followed.

¶ 23                              II. ANALYSIS

¶ 24                           A. *Krankel* Hearing

¶ 25          Defendant argues the trial court erred in failing to conduct a proper preliminary *Krankel* inquiry and appoint replacement counsel in response to his complaints about defense counsel's performance. We agree.

¶ 26          "The law requires the trial court to conduct some type of inquiry into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 79, 797 N.E.2d 631, 638 (2003) "[A] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention ***." *Moore*, 207 Ill. 2d at 79. In *People v. Ayres*, 2017 IL 120071, ¶ 18, 88 N.E.3d 732 , our supreme court found a defendant's "clear claim asserting ineffective assistance of counsel, either orally or in writing, *** is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." See also *People v. Thomas*, 2017 IL App (4th) 150815, ¶ 26, 93 N.E.3d 664 (noting "[c]ourts have found a defendant is entitled to a *Krankel* inquiry when the defendant makes an explicit or 'clear' complaint of trial counsel's performance or ineffective assistance of counsel"). This does not mean, however, the defendant must provide all the underlying facts upon which his *pro se* claim is based. Citing *Ayres*, our supreme court in *People v. Bates*, 2019 IL 124143, ¶ 15, found "a *pro se* defendant need not provide the underlying factual basis for his claim so long as he alleges that he has received 'ineffective assistance of counsel.' " If defendant raises the issue of

- 13 -

ineffective assistance of counsel, the trial court must conduct an "inquiry sufficient to determine the factual basis of the claim." *People v. Banks*, 237 Ill. 2d 154, 213, 934 N.E.2d 435, 468 (2010). Three factors to consider when deciding whether the *Krankel* inquiry was sufficient include "(1) whether there was some interchange between the trial court and defense counsel regarding the facts and circumstances surrounding the allegedly ineffective representation, (2) the sufficiency of defendant's *pro se* allegations of ineffective assistance, and (3) the trial court's knowledge of defense counsel's performance at trial and the sufficiency of the defendant's allegations on their face." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 71, (citing *Moore*, 207 Ill. 2d at 78-79).

¶ 27 In *People v. Jolly*, 2014 IL 117142, ¶ 29, 25 N.E.3d 1127 (quoting *Moore*, 207 Ill. 2d at 77-78), the supreme court, noting new counsel is not automatically appointed when a defendant asserts *pro se* claims of ineffective assistance, discussed the steps to be followed:

" 'when a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed.' "

"[T]he primary purpose of the preliminary inquiry is to give the defendant an opportunity to flesh out his claim of ineffective assistance so the court can determine whether appointment of new counsel is necessary." *Ayres*, 2017 IL 120071, ¶ 20.

¶ 28    On appeal, "[t]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78. "The issue of whether the circuit court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo*. [Citation.] Similarly, we review *de novo* the legal question of whether harmless error applies to errors committed during a *Krankel* proceeding." *Jolly*, 2014 IL 117142, ¶ 28.

¶ 29    In this case, defendant's counsel initially raised "the issue of counsel" and a request for a "pre-*Krankel* hearing" as part of a written motion to continue the sentencing hearing, contending he had attempted to meet with defendant to prepare for sentencing and had been told by defendant to leave and that defendant did not want to meet with him again. Counsel suggested the hearing in order to allow defendant the opportunity to explain his reasons for no longer wanting counsel's representation.

¶ 30    At the hearing, counsel explained why he thought the hearing was necessary before proceeding to posttrial motions or sentencing. Upon being informed defendant had not seen counsel's motion, the trial court allowed him an unspecified amount of time while the hearing was ongoing to review it. Upon completion, the court then began to inquire of defendant. Referencing counsel's motion, the court asked, "[counsel] stated that you told him to leave and that he didn't—that you didn't want to meet with him anymore; is that correct?" After defendant acknowledged that to be true, the court then asked, "All right. Are you in effect making a claim that he was ineffective when he was representing you?" Defendant attempted to explain the last conversation he had with counsel "about things that I asked him to do before the trial actually took place which he just did not do." The court then informed defendant that if he was claiming ineffective assistance of counsel, he should write out his complaints about counsel, "so that he

- 15 -

would have a chance to respond, and I would have to—then I would be able to see this in writing and we can take each paragraph one by one, *and I can decide if your claim is meritorious or not*." (Emphasis added.) Although the court characterized the later hearing as a "pre-inquiry under *People versus Krankel*," it is the italicized language above which is a preview of things to come.

¶ 31        Defendant's submission included 15 pages of complaints and 5 additional pages of attachments referenced in several of his complaints. Within the letter, defendant alleged his trial attorney "did a poor job" and then outlined a series of allegations ranging from counsel's remarks during opening statements, which included information the court had expressly excluded as the result of counsel's successful argument during a pretrial hearing, to his failure to call witnesses defendant identified as having information relevant either to what he contended was the actual cause of the victim's injuries, or circumstances between defendant and the victim which might have motivated her to lie about him. Defendant also complained about counsel's failure to obtain and introduce telephone records for which defendant provided written authorization; the failure to secure a video which showed defendant, the victim, and two of the three girls who allegedly were responsible for the victim's injuries, all at the hospital; and the failure to object to certain evidence or to ask questions defendant submitted for direct and cross-examination of certain witnesses.

¶ 32        Defendant made an explicit or clear complaint regarding counsel's performance (*Cf. Thomas*, 2017 IL App (4th) 150815, ¶ 26), which was sufficient to "trigger the trial court's duty to conduct a *Krankel* inquiry." *Ayres*, 2017 IL 120071, ¶ 18. Furthermore, due to the numerous and varied allegations against defense counsel, it was proper for the trial court to conduct a preliminary inquiry to "flesh out [defendant's] claim of ineffective assistance so the

court can determine whether appointment of new counsel is necessary." *Ayres*, 2017 IL 120071, ¶ 20. We previously understood this language to mean the only question to be resolved at this hearing was whether the trial court should appoint new counsel to represent defendant on his claims of ineffective assistance. See *People v. Roddis*, 2018 IL App (4th) 170605, ¶ 47, 119 N.E.3d 52. Our supreme court recently sought to clarify the language in *Ayres*, as well as that of *People v. Moore*, 207 Ill. 2d 68, 797 N.E.2d 631 (2003), *People v. Johnson*, 159 Ill. 2d 97, 636 N.E.2d 485 (1994) and others, when it reversed this court's decision in *Roddis.* See *People v. Roddis*, 2020 IL 124352. There, our supreme court concluded trial courts "must be able to consider the merits *in their entirety* when determining whether to appoint new counsel on a *pro se* posttrial claim of ineffective assistance of counsel." (Emphasis in original.) *Roddis*, 2020 IL 124352, ¶ 61. It held that a trial court may consider both the factual and legal merits of a defendant's *pro se* posttrial allegations of ineffective assistance of counsel at the preliminary inquiry stage. This would effectively do away with the need to describe such hearings as "pre-*Krankel*" since the trial court is to analyze both the factual and legal merits of the complaint to determine whether to appoint counsel.

¶ 33    Here, the trial court proceeded as if it were conducting the full hearing on defendant's ineffectiveness claims. The transcript of the hearing extends almost 50 pages. After having received defendant's written claims, the court took each one individually, had defendant explain it in detail, occasionally asking questions or asking defendant to be more specific, and then allowing counsel the opportunity to respond. At times, the questioning went back and forth between defendant, counsel, and the trial court. During the hearing, there were a number of occasions where defendant and counsel disagreed factually as to what transpired. At one point, defendant made two specific claims about representations by counsel relating to the conflict of

interest. First, defendant said counsel told him throughout the pendency of the case that the State was pushing the issue of a conflict of interest and apparently wanted a hearing on it. On the day of trial, however, when defendant's counsel raised it before the court for the first time, the prosecutor said "she didn't have a problem with—or she never mentioned anything about, um, the conflict of interest." Next, defendant said counsel told him if he did not waive the conflict, "it could be another four or five months before I could get in trial again." The following exchange took place:

> "THE COURT: I believe at the time of your waiver, I questioned you—
>
> THE DEFENDANT: Yes.
>
> THE COURT:—whether that was your decision.
>
> THE DEFENDANT: Uh-huh.
>
> THE COURT:—and you in fact said it was your decision. I asked if you understood that, and you said you did understand it. Is that right.
>
> THE DEFENDANT: I did understand.
>
> THE COURT: So now you're saying you regret that decision, or—how is that his fault?"

¶ 34       "A trial court may, in its discretion, question witnesses to elicit the truth or clarify material issues that seem obscure as long as it does so in a fair and impartial manner." *In re Maher*, 314 Ill. App. 3d 1088, 1097, 734 N.E.2d 95, 102 (2000). The propriety of a judge's examination is dependent upon the individual circumstances of the case and normally rests within the discretion of the court. *People v. Wesley*, 18 Ill. 2d 138, 155, 163 N.E.2d 500, 509 (1959). However, it must not depart from its function as an impartial tribunal and assume the role of an advocate. *People v. Evans*, 2017 IL App (1st) 150091, ¶ 24, 80 N.E.3d 736. One method by

which reviewing courts have assessed whether a trial judge's examination crossed over into advocacy is whether the court's questions were intended to " 'elicit the truth' " on an otherwise obscure material issue, or were instead "argumentative or hostile." See *People v. Jackson*, 409 Ill. App. 3d 631, 649, 949 N.E.2d 215, 231 (2011), for an extreme example. Here, the court, in questioning defendant about his conflict waiver, recharacterized his two claims as "regret" and then asked, somewhat argumentatively, "how is that his fault?", meaning his counsel's fault. Although the trial court was making every effort to provide defendant with a full opportunity to express his various complaints, it must be remembered, at this stage of the proceedings, defendant was attempting to represent himself *pro se* and the court, if it was going to inquire further into the facts of specific allegations, was supposed to be assessing the need for alternate counsel in a " 'neutral and nonadversarial' " manner. *Jolly*, 2014 IL 117142, ¶ 38.

¶ 35　　　　With regard to the conflict issue, defendant's claims, as noted above, revolved around representations made to him by counsel. This created a situation where, if counsel disagreed or disputed defendant's version of the incidents, there was no way to resolve them without appointing separate counsel since the State's comments to the court clearly cast doubt on the representations defendant said his attorney made. Defendant said, throughout the pendency of the case, counsel represented to him that the State was pushing the conflict issue and that counsel told him if he did not waive the conflict, it could be four or five months before he might proceed to trial. When the court ultimately asked counsel to respond, it never inquired about either of the two claims defendant made regarding the conflict issue, and counsel never addressed either of them specifically other than to say he did not recall telling defendant "it's gonna be two or three months if you don't waive it." Instead, counsel said the court was aware of the circumstances at the time.

¶ 36        It is unclear from the record exactly how the conflict issue arose in the first place because the first reference on the record comes after an apparent conversation between the trial court and counsel in chambers during a recess immediately before jury selection was to begin. The record begins with the court discussing a "possible conflict of interest" and defendant's counsel's opinion there is a waivable *per se* conflict. The record also reveals the State seemed genuinely surprised when defense counsel raised the issue immediately before *voir dire* as the State seemed to lack details about the extent of defense counsel's involvement in previously representing the victim, but it expressed concern about possible issues on appeal. Defendant's counsel said he did not know the State's position on waiver but that defendant was willing to waive the issue. This information was clearly available to the court at the time of the "pre-*Krankel*" hearing and of which it could take notice when assessing the need for alternate counsel. The conflict between counsel's representations to his client and those to the court were obvious. The State had made it clear there was no prior reference to a conflict and that they were not opposed to waiver; they simply wanted something on the record. Defendant said his attorney discussed the conflict throughout pretrial preparation, claiming the State was "pushing the conflict issue." This, and defendant's assertion his counsel told him it could be "four or five months" before he proceeded to trial if the conflict was not waived, were never directly addressed by counsel in his response.

¶ 37        Considering the last-minute disclosure of what defense counsel characterized as a *per se* conflict, coupled with his assertion defendant was ready to waive, and the State's indication this matter had not previously been raised by anyone, the factual conflict between counsel and his client's representation of how this matter arose was significant. Further, the trial court had to be aware there were issues about the conflict which remained unexplained, such as,

if counsel and his client had already discussed the conflict and waiver, why was it never brought to the court's attention until immediately before jury selection? Or, why did this issue not arise until defendant rejected an apparently last-minute plea offer from the State? In fact, according to the record, after waiting for jury selection to begin, the court had to release the jury for the day because of this issue. Defense counsel's claim he had no idea what the State's position might be is perplexing in light of defendant's assertion his lawyer had been telling him throughout the case the State was "pushing" the conflict issue. According to defendant, he was aware of the possible conflict as far back as when counsel was assigned to him by the public defender, who was to have discussed this with counsel. Notably, counsel did not deny this, or even comment on it. Further, the court was aware at the earlier hearing, counsel said he had represented defendant previously—a point defendant vehemently denied. These are significant factual issues apparent from the record and available to the court in deciding whether alternate counsel needed to be appointed to flesh out defendant's claims for a full hearing. " '[D]uring this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim.' " *Jolly*, 2014 IL 117142, ¶ 30 (quoting *Moore*, 207 Ill. 2d at 78). Instead, although with the best of intentions, the trial court was drawn into deciding the merits of defendant's *pro se* claims simply by asserting defendant "regretted" his waiver decision.

¶ 38          Defendant complained about counsel's failure to acquire a video which allegedly depicted defendant, the victim, and at least two of the three girls who were alleged to have actually inflicted the injuries on the victim for which defendant was on trial. According to defendant, on the video, which was, at the time, circulating on the Internet, the girls were

"openly talking about what they had did [*sic*] to this victim." When counsel was given the opportunity to respond, he initially indicated he looked at the video, which was apparently a screen shot of the video playing on another device, decided he could not lay a proper foundation, and "it didn't lend anything to complete our theory of the case." However, defendant maintained that counsel's "theory of the case" was never discussed with him. Defendant later contended he asked counsel to get the actual video when it was still playing on social media but counsel refused. The trial court then asked, "[Counsel,] did you do everything in your power to locate that video and examine the video to see if it could be used as potential evidence on your client's behalf?" In light of counsel's response that he did not attempt to obtain a copy of the video, was unsure whether his investigator had obtained a copy, and the fact that counsel's "trial strategy" discussion was with the investigator but apparently never with the defendant, there were sufficient factual issues raised by defendant's claim to warrant the appointment of counsel to investigate further. Defendant maintained the girls on the video expressly discussed causing the injuries for which the victim was being hospitalized. If true, it would be difficult to conclude how such evidence was not relevant. This, however, was a question to be answered after new counsel was appointed to "flesh out" defendant's allegations. See *People v. Wilson*, 2019 IL App (4th) 180214, ¶ 21, 137 N.E.3d 868. The video may well have been of no benefit, but such was not the issue before the court at that point in time. The issue was whether the claim was sufficient to support appointing new counsel to investigate it for purposes of assessing counsel's representation. A video which purports to show third parties discussing their involvement in causing the injuries for which defendant was on trial would be hard for any counsel to ignore. The claim he could not lay a foundation for the video seems questionable since defendant and the victim were also on the video and knew where and when it was taken.

¶ 39    There were a number of other allegations raised regarding counsel's failure to question or call certain witnesses or cross-examine others, much of which was properly characterized by the trial court as matters of trial strategy and, therefore, not the proper subject of a full hearing. See *People v. West*, 187 Ill. 2d 418, 432, 719 N.E.2d 664, 673 (1999) (claims based on defense counsel's trial strategy are generally immune from ineffective assistance of counsel claims). However, the two issues mentioned above were, in our opinion, sufficient to place the trial court on notice there was a need for the appointment of alternate counsel. Factual questions surrounding the conflict waiver and alleged failure to acquire a possibly exculpatory video were sufficient to raise issues of " 'possible neglect of the case' " and should have warranted the appointment of new counsel to independently investigate and represent defendant at a separate hearing. *Wilson*, 2019 IL App (4th) 180214, ¶ 20. Rather than determining whether new counsel should be appointed, the court lumped all of defendant's claims into the category of questions of trial strategy and denied defendant's ineffective assistance of counsel claim. This was not the purpose of the hearing; instead the court was to evaluate whether there was a need for substitute counsel. Trial courts undoubtedly must evaluate the factual and legal bases for ineffectiveness claims; however, we would assume that would still be within the context of determining whether counsel needs to be appointed. Therein lies one of the issues which remain unresolved by our supreme court's *Roddis* decision; how far does the trial court go when addressing both the factual and legal bases for a claim of ineffective assistance of counsel? There are many claims of ineffective assistance which, on their face, are either so contrary to the record or so fanciful as to defy all reasonable logic. For those, any trial court should be able to decide whether alternate counsel is necessary. Where, however, the claims are more involved, have some level of support in the record or are not directly contradicted by counsel, what is the trial

- 23 -

court to do? It is not fair for a *pro se* defendant to be expected to adequately present his claims without the assistance of counsel, yet, it would appear he or she must be prepared to do so, to some degree, just to obtain the assistance of counsel; which was what we understood the intended purpose of a *Krankel* hearing to be. Here, we believe once the trial court saw there were clear factual disputes relevant to an issue as sensitive as a conflict waiver, along with issues relating to a possibly exculpatory video, the decision should have been made to appoint alternate counsel. For these reasons, we believe the trial court erred by failing to appoint substitute counsel to independently investigate and present defendant's ineffective assistance of counsel claims after it conducted its *Krankel* hearing.

¶ 40                            B. Petition for Rehearing

¶ 41        On January 28, 2020, we filed a Rule 23 order reversing and remanding the trial court's decision to dismiss defendant's ineffective assistance of counsel claim at the pre-*Krankel* hearing. On February 10, 2020, we agreed to allow the State's motion for a rehearing based on the recent supreme court decision in *Roddis*, 2020 IL 124352. We have discussed the holding of *Roddis* above. Our supreme court explained that because the trial court is "most familiar with the proceedings at issue," it is "best situated" to consider both the factual and legal merits of a defendant's claim(s) of ineffective assistance in order to decide whether the claims "lack merit" or require the appointment of independent counsel to pursue them. *Roddis*, 2020 IL 124352, ¶ 61. We acknowledge the trial court is best situated to review the legal and factual merits when reviewing a defendant's posttrial ineffective assistance of counsel claim as part of a *Krankel* inquiry. The supreme court stated in *Roddis* there is no exhaustive categorical list or particular framework to which a trial court must adhere when doing so. *Roddis*, 2020 IL 124352 ¶ 64. Our supreme court emphasized that reviewing courts must "adhere to a case-by-case, fact specific

examination, driven by the record." *Roddis*, 2020 IL 124352, ¶ 64. Here, defendant raised specific claims of ineffective assistance which related not only to a *per se* conflict of interest but also to whether counsel's pretrial representations to defendant were consistent with the evidence in the record. Counsel himself said he had no idea what the State's position was with regard to a conflict and waiver. The State said there had been no previous mention of a conflict. Defendant said his lawyer talked about it early in the case, said the State was the one pushing the issue, and that if he did not waive it, he would remain in custody substantially longer. Further, counsel's changing explanation for disregarding a video which apparently contained exculpatory information should have been concerning to the trial court. Counsel did not deny the content of the video as represented by defendant; he simply said he did not think it would "add anything to our case". He acknowledged never attempting to get a copy of the video and was not sure whether his investigator had. His reasoning was that it was not consistent with the "theory of the case" he discussed with his investigator; never addressing defendant's claim he did not discuss this theory with defendant. Although there were additional allegations raised; some of which could be discounted as matters of trial strategy, the existence of at least these two areas of conflict should have been sufficient to warrant appointment of alternate counsel, who could then proceed to separate wheat from chaff.

¶ 42                                    III. CONCLUSION

¶ 43            For the reasons stated, the judgment of the circuit court of Macon County is reversed. The matter is remanded for the appointment of new counsel to represent the defendant on the merits of this posttrial claim that defense counsel was ineffective and take whatever action appointed counsel deems appropriate. See *People v. Lawson*, 2019 IL App (4th) 180452, ¶¶ 54-55. We take no position on the merits of such claim. Furthermore, because we conclude remand

is necessary for the appointment of new counsel to investigate defendant's ineffective assistance claims, we need not consider the other issues raised by defendant on appeal. *People v. Bell*, 2018 IL App (4th) 151016, ¶ 37, 100 N.E.3d 177.

¶ 44          Reversed and remanded with directions.